*Huber, Kemp & Stainback* for defendant in error.

IN THE MATTER OF THE APPLICATION OF THE WAILUKU SUGAR COMPANY AND THE HAWAIIAN COMMERCIAL & SUGAR COMPANY FOR A CERTIFICATE OF BOUNDARIES FOR THE AHUPUAA OF WAIKAPU, LOCATED IN THE DISTRICT OF WAILUKU, ISLAND OF MAUI.

No. 1812.

ARGUED MAY 27, 1929. DECIDED JUNE 6, 1929.

PERRY, C. J., BANKS, J., AND CIRCUIT JUDGE CRISTY IN PLACE OF PARSONS, J., ABSENT.

OPINION OF THE COURT BY PERRY, C. J.
(Circuit Judge Cristy dissenting in part.)

This is a proceeding instituted before the commissioner of boundaries for the second judicial circuit to determine certain of the boundaries of the ahupuaa of Waikapu, situate on the island of Maui. Alleging that they are the owners of all adjoining lands except the ahupuaa of Ukumehame, which is owned by the Territory of Hawaii, the petitioners asked merely that those

boundaries be settled which are common to these two ahupuaas.  As to the boundaries between the two lands, the parties are now in accord, with the sole exception of two courses and distances.

The ahupuaa of Waikapu was granted, by name only, by Royal Patent 3152, to one Henry Cornwell.  The adjoining ahupuaa of Ukumehame was likewise reserved to the government by name only.  The boundaries of the latter, however, were judicially settled in 1883 by a decision of L. Aholo, commissioner of boundaries, in a proceeding duly instituted for that purpose.  The owner of Waikapu was a party to that proceeding, was represented and was heard.  The adjudication by Commissioner Aholo of the boundaries of Ukumehame is therefore binding upon the present owners of Waikapu.  This is conceded.  No effort is being now made to secure for Waikapu boundaries different from those thus adjudicated for Ukumehame; and the only effort is to interpret and apply the common boundaries so adjudicated.

In August, 1874, J. M. Alexander, a surveyor, made a survey and map of Ukumehame.  His description and his map are in evidence in this case.  In the proceeding before the commissioner in 1883 the parties stipulated in writing that "the boundary between Ukumehame and Waikapu, according to map and survey of J. M. Alexander, made in August, 1874, now produced at the present hearing before L. Aholo, boundary commissioner," was correct, with the exception that a "note" appearing at the end of Alexander's written description, but intended by him to be inserted in connection with his sixteenth course and distance, should be stricken out.  That note reads: "Waikapu claims a strip of seashore one chain broad, reaching from Kapoli to Manawainui Ravine."  The stipulation was entered by the commissioner in his record and he thereupon adjudged the boundaries of Ukumehame to be

as stated in the written description prepared by Alexander (with the "note" stricken out).

The land of Ukumehame contains an area of 11,040 acres. It fronts on the ocean for a distance of about seven miles. The surveyor (Alexander) commenced his survey at a point on the ocean between Ukumehame and Olowalu and proceeded in a southeasterly direction (speaking generally) by twenty-one courses and distances, in every instance describing his course as being "along ocean," sometimes describing his courses as ending at stated places, as for example, "to Puaaloa," to "Muliwai" (a stream), "to Papalaau," "across Keanapaakai Landing," and sometimes not stating any definite place or point or object at which the course ended. His twenty-second course and distance read: "N. 18° 54′ E., 27.76 chains along ocean, R. bearing," (meaning reverse bearing) "S. 17° 40′ W." His twenty-third course and distance read: "N. 6° E., 144.90 chains along Waikapu to S. bank of ravine, N. W. of Puuhele to rock marked +, R. bearing S. 5° 42′ W.;" and his twenty-fourth course and distance read: "S. 69° 30′ W., 60.10 chains on ridge along Waikapu, R. bearing N. 70° 32′ E." (It should be here noted that in his original description Alexander describes his twenty-second course as running, as just stated, "27.76 chains along ocean" and not, as has been stated in some of the briefs and at the oral argument, "along ocean and across," which latter form of statement might lead to the inquiry as to what he meant by saying "and across." In Commissioner Aholo's decision in his bound volume he does say "27.76 chains along ocean and across," the last four words being indicated by ditto marks, but this was obviously an error in inserting the last set of ditto marks.)

The whole controversy in this case is as to the true location on the ground of the twenty-third and twenty-

fourth courses and distances and as to the true point on the ground at which the twenty-second course and distance end. Both parties are agreed as to the identity and the location of the "rock marked +" referred to in the twenty-third course. The rock and the cross are in existence today and have been identified. Since the definite point at which the twenty-second course ends is not stated in the description and since the end of the twenty-fourth course is described by Alexander merely as being "on ridge along Waikapu," both parties have, very properly, commenced at the known "rock marked +" and used Alexander's reverse bearings in an effort to find the end of course twenty-two on the ocean and the end of course twenty-four on the ridge. The parties are agreed that Alexander's bearings in courses twenty-three and twenty-four are both erroneous and that when applied on the ground the twenty-third course goes too far inland and the twenty-fourth course goes too far to the north, is too short and does not end "on the ridge" but ends in a ravine. Both parties are agreed that these two bearings should therefore be discarded and that the monuments actually used by Alexander in his survey when on the ground should be sought, one as the end of his twenty-second course and the beginning of his twenty-third course, and the other as the end of his twenty-fourth course.

The Territory claims that a certain spring, which existed between high water mark and low water mark at the time of the making of the survey by Alexander, and known as Kapoli Spring, was the point at the seashore. The petitioners claim a point at the seashore a little further southwest, not characterized by any particular physical feature, and which is reached by running from the marked rock on a slightly different bearing, passing Kapoli Spring at a little distance inland and continuing

to the end of the distance named in Alexander's twenty-third course and then adding an extra course from that point to the claimed point on the seashore. On the ridge the parties claim for the end of the twenty-fourth course points about fifty feet distant from each other at the end of courses about twenty-five feet apart from each other on the ridge. The commissioner, in deciding the case at bar, found in favor of the petitioners on both subjects. He gave his reasons for preferring the one point on the ridge to the other, but gave no reasons for his conclusion concerning the points in dispute at the seashore.

Both from his written description by metes and bounds and from his map there can be no doubt, we think, that the first twenty-two courses in the boundaries of Ukumehame as surveyed and declared by Alexander ran "along the ocean" which means along high water mark, at least when not otherwise expressed. The whole of the twenty-second course was meant by him to run along the ocean just as clearly as the whole of each of his preceding twenty-one courses was intended by him to run along the ocean. It is equally clear that his twenty-third course was intended by him to strike inland from a point at the ocean to the marked rock. While the point at which the twenty-second course ends and the twenty-third course begins was not by him described in words in his written description, it is clearly shown on his map made at the same time and as a result of the same survey to be "Kapoli Spring." The words "Kapoli Spring" are written on the map opposite the point where the lines of the two courses meet, in the same manner and just as clearly as other places are marked on his map at the points where others of his courses meet. For example, "Papawai Spring" is one of the places so named. The words "Keanapaakai Landing" are written in the same manner and the description requires the course number nineteen to go "across Keana-

paakai Landing." If there were nothing else in the case we think that this consideration alone should lead to the conclusion that Kapoli Spring is the point at which the twenty-second and twenty-third courses meet; but there was other evidence in the case confirmatory of this view. James Cornwell, a grandson of Henry Cornwell, the patentee of Waikapu, testified in the case at bar that his grandmother, who, with his grandfather, had lived in the vicinity, had told him that a certain "beach house" standing a few feet to the southwest of Kapoli Spring was on the land of Ukumehame and that "we have no right there." He testified: "My grandmother told me it belongs to the government; when they told you to go, go." The same witness and three other witnesses gave testimony to the effect that Kapoli Spring was in their youth a well known spring with certain virtues and traditions which they described attached to it. They spoke of certain large rocks in the ocean immediately in front of the spring, rocks well known to the people of that day and still in existence today at the same places. One of the other witnesses, Kamaka Kailianu, seventy-three years of age, in addition to his testimony concerning Kapoli Spring, a spring whose water flowed visibly at low tide but the outlet of which was covered by the water of the ocean at high tide, said that the boundary between Waikapu and Ukumehame ran in a straight line from the marked rock to Kapoli Spring. Another, Moke Kalani, sixty-three years of age, said that at the direction of Henry Cornwell, then the owner of Waikapu, he helped to dig a well immediately inland from the natural outlet of Kapoli Spring, this in order that Cornwell's cattle might have water to drink at all stages of the tide, and that when the digging of the well had commenced Henry Cornwell personally directed the laborers to change its location about two feet further southeast than it was

being dug, giving as the reason for his orders that "he did not want to have the well dug on the Ukumehame side."

No sufficient reason appears for disbelieving these witnesses. They lived for many years not far from Kapoli Spring. James Cornwell is the grandson of the original owner of Waikapu. His grandmother's statement to him is a statement coming from a true kamaaina and was made against her own and her husband's interest. Henry Cornwell's directions to the laborers who were digging the well were clearly admissions against interest and tend very strongly to support the view that Kapoli Spring was a point on the boundary.

Again, the stipulation entered into by the parties before Commissioner Aholo that the surveyor's note reading "Waikapu claims a strip of seashore one chain broad, reaching from Kapoli to Manawainui Ravine," should be deleted from the description about to be entered by the commissioner is significant. The obvious inference is that Henry Cornwell, the owner of Waikapu, was satisfied that he had no proper basis for claiming that he owned, and that he did not own, any land along the seashore southwest of Kapoli Spring. Such an admission, made fifty-four years ago when the facts were well known to all concerned and when kamaaina witnesses were easily available, is important. This consideration strongly indicates that Kapoli Spring is one of the points on the boundary. The fact that the note that was stricken describes the strip of land as reaching "from Kapoli" instead of describing it as reaching "from Kapoli Spring" does not detract from the force of this item of evidence. It is true that one of the witnesses made a statement that the place called Kapoli in the vicinity of the spring was about two acres in extent, but the same witness also said, and another witness testified, that the place called Kapoli was

about as large as the room in which the hearing before the present commissioner was being had, a room about fifteen feet square. The spring was the only outstanding landmark at Kapoli. When in his note the surveyor said that Waikapu claimed a strip of land reaching "from Kapoli" to Manawainui Ravine, and when Henry Cornwell in effect said that he would no longer make that claim, we believe upon the evidence that what the surveyor and the owner had in mind was the spring and no other part of Kapoli. A piece of land fifteen feet square on the seashore at and near Kapoli Spring does not indicate any definite point as a boundary mark other than the spring itself.

The only evidence against this view is that of the surveyor of the petitioners, that for the course from the marked rock to the sea he adopted a bearing claimed by him to have been followed by the late S. M. Kanakanui, a surveyor for the government, in surveying and describing, about 1903, a part of Ukumehame which the Territory was desirous of leasing, and later did lease, to the owners of Waikapu. There is a dispute in this case as to where Kanakanui's course from the marked rock ran towards the ocean, one at least of the surveyors of the Territory claiming that it ran from the marked rock to Kapoli Spring. With the merits of this dispute we are not greatly concerned. From another map made by the same surveyor (Kanakanui) in 1908 it appears clearly that he located the boundary between Waikapu and Ukumehame as running from the marked rock directly to Kapoli Spring. Kanakanui's work on the ground and his description made for the purposes of the lease were not under circumstances operating as an estoppel against the Territory. We are inclined to think that he, too, regarded Kapoli Spring as being the point at the seashore. But if

he did err in that respect,,the Territory is not now bound by the error.

The great weakness of the boundary contended for by the petitioners between the marked rock and the sea is that it follows and requires two lines, that is, two courses and two distances. There can be no doubt that Alexander's description, as well as his map, requires and permits one course only from a point at the seashore to the marked rock. To now decree two courses between those two monuments would be to depart radically from his statement of the boundaries, which was adopted by the boundary commissioner in 1883. There may be circumstances under which an extra course not called for in words by the description can be added by the court in order to close a survey. However that may be, there are no circumstances in the case at bar justifying such action. It is not required here in order to close the survey. The survey can be closed by running the line from Kapoli Spring. It could even be closed in one straight line direct from the ocean at some other point to the marked rock. It is merely a question of the ascertainment of the point at the ocean reached by Alexander in his twenty-second course and from which he started on his twenty-third course.

Our conclusion is, as to this subject, that the twenty-second course, as described in the commissioner's decision of 1883, ends and the twenty-third course begins at Kapoli Spring.

As to the two points on the ridge at the end of the twenty-fourth course, there is but little difference between them in location. If the question had been determined by a jury, the verdict, whichever way it went, would have to be deemed supported by the evidence. The commissioner was on the ground and was aided by a personal view of the physical features involved. We cannot

.say with any degree of certainty that he erred in his choice.

Considerable has been said in the briefs and in oral argument concerning Alexander's "angle of divergence" between his bearings for the twenty-third and twenty-fourth courses and it has been claimed by the petitioners that, if the commissioner's decision as to the line to the ridge should be found correct, that would necessarily require an adoption of the commissioner's decision as to the line to the seashore and, on the other hand, it has been claimed by the Territory that, if the true point at the seashore is at Kapoli Spring, then necessarily the commissioner's decision as to the point on the ridge must be reversed. We cannot take this view. No such force attaches to a mere angle of divergence. Surveyor Alexander did not set out to locate or apply at the marked rock any particular angle of divergence. That angle was the mere incidental result of two bearings which he did adopt, one from the rock to the sea and the other from the rock to the ridge. He may have erred to a greater extent in reading or in recording one of the bearings and to a less extent in reading or in recording the other of the bearings, just as he may have erred to a greater extent in reading or measuring or recording one of the distances and at the same time may have erred to a less extent in reading or measuring or recording the other of the distances.

The decree appealed from is reversed. A decree in conformity with these views will be entered upon presentation.

*A. G. M. Robertson* (*Robertson & Castle* on the brief) for Wailuku Sugar Co.

*H. R. Hewitt,* Attorney General, and *C. N. Tavares,* Second Deputy Attorney General (*C. N. Tavares* on the briefs), for the Territory.

OPINION OF CIRCUIT JUDGE CRISTY, CONCURRING IN
PART AND DISSENTING IN PART.

I concur in the decision that the line from Kapoli
Spring to the "+ rock" marks one of the disputed bound-
ary lines. I do *not* concur in supporting the commis-
sioner's finding as to the line from the "+ rock" to the
ridge. The record, in my opinion, clearly shows that the
line to the ridge was located by the applicant's surveyor
and adopted by the commissioner *to justify, through the
use of the agreed angle of divergence,* the erroneous lines
from the rock toward the ocean.

On the basis of the correct boundary being from Kapoli
Spring to the rock, the parties' agreement as to the
angle of divergence, taken in connection with the evi-
dence as to the condition of the ridge looking upward
from the "+ rock" and with the comments of the com-
missioner in the record and further in connection with
the rest of the record would necessitate a complete modi-
fication of both disputed lines to conform to the claim of
the Territory.